[Cite as *Payson v. Hennessey*, 2018-Ohio-2437.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| SUSAN PAYSON, | : | |
| | | CASE NOS. CA2017-03-030 |
| Plaintiff-Appellant/Cross-Appellee, | : | CA2017-03-036 |
| | : | O P I N I O N |
| - vs - | | 6/25/2018 |
| | : | |
| G. DANIEL HENNESSEY, | | |
| | : | |
| Defendant-Appellee/Cross-Appellant. | : | |
| | : | |

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. 15 DR 37939

Thomas G. Eagle, 3400 North State Route 741, Lebanon, Ohio 45036, for appellant/cross-appellee

Timothy A. Tepe, 255 East Fifth Street, Suite 1900, Cincinnati, Ohio 45202, for appellee/cross-appellant

**HENDRICKSON, J.**

{¶ 1} Appellant/cross-appellee, Susan Payson ("Mother"), appeals the decision of the Warren County Common Pleas Court, Domestic Relations Division, which ordered shared parenting of Mother's and appellee/cross-appellant, G. Daniel Hennessey's ("Father"), three children and which designated Father as the residential parent for school purposes. Father cross-appeals with respect to the court's order concerning marital real estate. For the

reasons discussed below, this court affirms the decision of the domestic relations court.

{¶ 2} Mother and Father wed in 2002. Mother was an emergency room physician and Father was a self-employed political lobbyist. Both were producing excellent incomes. Father eventually left his business in favor of managing rental real estate that the couple purchased.

{¶ 3} The marriage produced children born in 2006, 2007, and 2013. Mother began working less in favor of staying home with the children. As the real estate market suffered in or around 2008, the rental properties Father was managing stopped producing income or produced negligible income. Eventually, the properties went into foreclosure. Between 2010 and 2013, Mother's and Father's joint annual income averaged approximately $15,000.

{¶ 4} In 2013, Mother allowed her emergency room certification to lapse. This decision would later render Mother unable to obtain another position as an emergency room physician. Both parents agreed that Mother would home school the children. In early 2013, Father left the marital home for a political job in Michigan while Mother stayed home with the children and home schooled the two older children.

{¶ 5} On average, Father would return home every other weekend. Father lived and worked in Michigan for almost two years. He left Michigan to run a political campaign in Kentucky and then returned to Michigan. Finally, Father moved to Indianapolis for employment with a different political campaign.

{¶ 6} In 2015, Mother filed a complaint for divorce and requested custody of the children. The court initially granted Mother temporary custody of the children and granted parenting time to Father. In his answer, Father requested to be named residential parent.

{¶ 7} Mother moved the court to appoint Dr. Gordon Harris, a psychologist, to perform a custody evaluation for the purposes of making a parenting recommendation to the

court. Likewise, Father moved the court to appoint a guardian ad litem ("GAL") for the children. Father's motion alleged that he was concerned that the children were not receiving an adequate education through Mother's home schooling efforts and that Mother refused to place the children in a traditional school. The court granted both motions and appointed Dr. Harris and a GAL for the children.

{¶ 8} After meeting with the family on multiple occasions, Dr. Harris produced a lengthy written report recommending that the court designate Father the residential parent and that Mother should receive parenting time. Dr. Harris found that Mother was a highly inflexible individual who exhibited poor judgment and that there were serious concerns about the educational aptitude of the two older children whom Mother was homeschooling. After assessing and testing the children individually, Dr. Harris found that the children were not functioning at an appropriate educational level, and that it was difficult to understand how Mother, a highly-intelligent person, could believe that her children were at an appropriate educational level for their age. Dr. Harris opined that Mother's perception of her children was "distorted."

{¶ 9} Similarly, the GAL's report recommended that the court designate Father the residential parent. The GAL found serious deficiencies in Mother's care for the children with respect to the children's education, health care, and social development. The GAL also found that Mother failed to recognize that there were any issues with her children and that Mother was defiant in defense of her parentings skills.

{¶ 10} The matter proceeded to a trial where parenting rights was the most contested issue. Mother called various expert and lay witnesses who criticized Dr. Harris' and the GAL's reports and recommendations. Mother testified that she was ameliorating Father's and Dr. Harris' educational concerns by enrolling the children part-time at a local Montessori

school. Mother was working every other weekend at an urgent care center, averaging 40 hours a month.

{¶ 11} Father testified that he was employed through the end of the year with a political campaign in Indiana but that he was seeking a permanent, stable position through his political connections in Indiana. He had recently moved to a residence that was within walking distance to a Catholic school where he wanted to enroll the children if the court designated him residential parent. While the divorce was pending, Father hired a tutor to work with the children during his parenting time. Father had begun a new relationship with a woman he met through one of his political jobs and was engaged to marry her.

{¶ 12} A magistrate issued a decision recommending that Father be named residential parent for school purposes and that Mother receive parenting time. The magistrate found that there were various concerns with Mother's care of the children, e.g., the cleanliness of the home and the children's lack of social interaction with friends and their community. However, the magistrate's overriding concern was the children's education. The magistrate concluded that Mother could not provide for the children's education and was only willing to make changes following the damaging reports submitted by Dr. Harris and the GAL. However, the magistrate recommended that Mother receive equal parenting time if she moved to within fifteen miles from Father's residence in Indiana.

{¶ 13} Both parties filed objections to certain aspects of the magistrate's decision. While these objections were pending, and several months after the children had been residing primarily with Father, Mother moved for a modification of parenting rights. In support of her motion, Mother alleged that she could now demonstrate the falsity of the grounds upon which the court named Father residential parent for school purposes, i.e., the children's alleged educational deficiencies. Specifically, Mother argued that the two older children were

assessed by their new grade school shortly after beginning school and that they both scored well. Mother further argued that Father was disrespectful to her and of her parenting rights and was not acting in the children's best interest with respect to the children's medical needs.

{¶ 14} The court issued a decision on the parties' objections to the magistrate's decision, overruling Mother's objection to the court's designation of Father as residential parent. Several months later the court issued a final decree of divorce although the court had not yet ruled on Mother's motion for a modification of parenting rights. Mother appealed but then moved this court to stay the appeal and remand the case so that the lower court could resolve the new parenting rights motion. This court granted Mother's motion and the case was remanded to the trial court.

{¶ 15} The domestic relations court heard evidence over several days on Mother's motion. Much of the testimony and evidence concerned how quickly the two older children began to excel at their traditional school, which called into question the severity of their educational deficiencies. Mother also was concerned that Father was disparaging her or was not involving her in making parenting decisions.

{¶ 16} Father testified that the children were doing well living with him and attending the nearby Catholic grade school. The children's paternal grandmother was paying their tuition. Father now had a permanent position with the state of Indiana with health insurance benefits. Father indicated that the children's progress in a traditional school was attributable to the tutoring he obtained for them. Father testified that he was not disrespectful of Mother's parenting rights but that problems arose because Mother was overly insistent on raising the children her way. As an example, when he informed Mother he wanted to take the children to Disney World she told him he could not because time "with Mickey" was "less important than spending time with me."

{¶ 17}  The GAL also submitted an updated report to the trial court, which reported that the children were happy and healthy and doing well in their school in Indianapolis.  The GAL recommended that the current shared parenting plan continue.

{¶ 18}  The court denied Mother's motion, concluding that it was in the children's best interest to continue to reside with Father and attend school in Indiana.

{¶ 19}  In this appeal, Mother's first assignment of error challenges the court's decisions with respect to shared parenting.  Mother's second assignment of error involves the court's order directing the parties to pay the GAL's fees.  Father's assignment of error challenges the court's decision on the division of marital property with respect to a parcel of out-of-state real estate.

{¶ 20}  Mother's Assignment of Error No. 1:

{¶ 21}  THE TRIAL COURT ERRED IN ALLOCATING PARENTING RIGHTS.

{¶ 22}  Mother alleges that the court erred by designating Father as the residential parent for school purposes and relocating the children to Father's residence in Indiana.

{¶ 23}  R.C. 3109.04 governs the award of parental rights and responsibilities. In making this determination, the court's primary concern is the best interest of the child. *Albrecht v. Albrecht*, 12th Dist. Butler Nos. CA2014-12-240 and CA2014-12-245, 2015-Ohio-4916, ¶ 22.  To determine the best interest of a child, R.C. 3109.04(F)(1) requires the domestic relations court to consider all relevant factors. *Bristow v. Bristow*, 12th Dist. Butler No. CA2009-05-139, 2010-Ohio-3469, ¶ 8.  These factors include, but are not limited to (1) the wishes of the parents, (2) the child's interaction and interrelationship with his parents, siblings, and other persons who may significantly affect the child's best interest, (3) the child's adjustment to home, school and community, (4) the mental and physical health of all persons involved, and (5) the likelihood that the caregiver would honor and facilitate visitation and

- 6 -

parenting time. *Denier v. Carnes-Denier*, 12th Dist. Warren No. CA2015-11-106, 2016-Ohio-4998, ¶ 14. With regard to whether shared parenting is in the child's best interest, the court must consider the additional factors set forth in R.C. 3109.04(F)(2). *Id.* at ¶ 15.

{¶ 24} An appellate court reviews a trial court's parenting rights determination for an abuse of discretion. *Gibson v. Gibson*, 12th Dist. Clinton No. CA2016-01-002, 2016-Ohio-4996, ¶15. An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *Denier* at ¶ 16. The discretion which a trial court enjoys in custody matters "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Gibson* at ¶ 15.

{¶ 25} Mother does not challenge the domestic relation's court's determination pursuant to R.C. 3109.04(F)(2) that shared parenting was in the best interest of the children. Instead, Mother limits her arguments to the court's decision that designating Father as residential parent was in the children's best interest under R.C. 3109.04(F)(1).

{¶ 26} The record reflects that the domestic relations court considered all relevant factors under R.C. 3109.04(F)(1) in designating Father residential parent. The court found the following with respect to each statutory factor.

### (a) The wishes of the child's parents regarding the child's care

{¶ 27} The court found that both parents wanted the children to live primarily with them and both wanted to be the decision maker with respect to their children's lives, especially regarding education. Accordingly, this factor favored neither parent.

{¶ 28} Mother argues that the court should have weighed this factor in her favor as she had arranged her limited work schedule with the urgent care facility so that she could be with the children. Mother argues that the children will be "wards" of third-party care providers

- 7 -

because Father had full-time employment, hired a nanny to watch the children during the week, and Father's fiancé was assisting with caring for the children. However, there was no evidence that the children are suffering under the care arrangement provided by Father.

**(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest**

{¶ 29} The court noted that the children have good relationships with both parents and with Father's fiancé. Thus, this factor does not weigh in either parent's favor.

{¶ 30} Mother argues that the court should have weighed this factor in her favor because the children had lived their entire lives with her in Lebanon, Ohio and that the children had no connections with anyone in Indiana. Mother suggests that the children had social connections in Lebanon and were engaged in outdoor activities. However, there was little evidence at trial indicating that the children had any social presence while living with Mother in Ohio.

{¶ 31} As the domestic relations court noted, Mother did not produce photographs depicting the children engaged in sporting events, or ask coaches or others to testify. Instead, Mother called one witness who said she had last seen Mother and the children 15 months earlier and had last been inside Mother's home some 15 years prior. Another witness was a neighbor of Mother's parents, who lived 40 minutes away and did not know the age of the children. The evidence admitted at trial would support the conclusion that Mother and the children led a cloistered existence, possibly due to Mother's fervent religious beliefs.

**(d) The child's adjustment to the child's home, school, and community**

{¶ 32} The magistrate noted that the children have always lived in Lebanon. However, because of their lack of social interaction with the community, this was not a case where relocating the children to live with Father in Indiana would be detrimental to their mental health. The court noted that the children were young enough to generate a

connection with a new community. Accordingly, this factor did not weigh in favor of either parent.

{¶ 33} Mother again argues that the children had lived in Lebanon their entire lives and had no connections with Indiana. However, as discussed above, there was no credible evidence establishing that the children had any significant connection with the Lebanon community.

**(e) The mental and physical health of all persons involved in the situation**

{¶ 34} The court noted Dr. Harris' opinion that Mother's perception of her children was "distorted." This factor weighed in favor of Father.

{¶ 35} Mother primarily argues that the court should have considered some of the evidence indicating that Dr. Harris was also concerned with Father's decision-making ability. However, Dr. Harris found that Father was more capable than Mother of providing for the children's educational and social needs. The evidence submitted at trial corroborates the court's conclusion.

**(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights**

{¶ 36} The court found that both parents had demonstrated that they would facilitate each other's parenting time. Thus, this factor weighed in favor of neither parent. Mother argues that the evidence indicated that Father lacked respect for her or her wishes regarding parenting decisions. However, there was no evidence of any significant issues between the parties concerning honoring parenting time rights.

**(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor**

{¶ 37} This factor weighed in Mother's favor as there was evidence that Father had

failed once to pay child support. Father characterized this as a mistake by what he was informed by a Job and Family Services employee.

**(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state**

{¶ 38} The court noted that Father was living in Indiana under an employment contract with a political campaign that would end at the end of the current year. Then Father intended to find a permanent position in Indiana. By the time of the hearing on Mother's motion for a modification of parental rights, Father had obtained a permanent civil service position with the state of Indiana.

{¶ 39} In conclusion, the court found that both parents had their shortcomings, but the most concerning issue was the children's education. Dr. Harris' report indicated that the eldest child, who was nine years old, could read his name but could not spell it without assistance. The child also did not know his birthday. In testing, the child scored poorly on spelling and math tests, scoring in the fourth and fifth percentiles in those subjects, respectively.

{¶ 40} Similarly, the seven-year-old child displayed educational deficiencies. This child could not correctly spell his name and could not recall his birthday. He scored in the second percentile in word reading, the first percentile in sentence comprehension, the fifth percentile in spelling, and the 0.2 percentile in math.

{¶ 41} Thus, the court found the children's education was the most pressing concern and that Mother had been given the opportunity to promote the children's educational advancement but had demonstrated that she could not. Furthermore, Mother only began taking steps to correct the children's educational issues after the damaging reports of Dr. Harris and the GAL were submitted to the court.

{¶ 42} After a thorough review of the record, this court finds no abuse of discretion in

the trial court's decision designating Father as the residential parent for school purposes. Father presented credible evidence of concerning deficiencies in Mother's care for the children with respect to their education, living environment, medical care, and social interactions with the community. On the other hand, Father took steps during the pendency of the divorce to improve the children's education.

{¶ 43} Mother contributes much of her appellate brief to arguments challenging Dr. Harris' or the GAL's methodology or qualifications to render their opinions. This is essentially the same strategy she employed at trial with the goal of reducing the damage of Dr. Harris' report. However, these arguments go to the weight of the evidence, and this court must ordinarily defer to the fact finder on such matters. In this case, substantial credible evidence supported the conclusion that Father's concerns with Mother were valid and this court has no evidentiary reason before it to second guess the domestic relations court.

{¶ 44} This court also finds no abuse of discretion in the court's decision with respect to Mother's motion for a modification of parentings rights. In deciding that motion, the court considered each relevant statutory best-interest factor under R.C. 3109.04(F)(1) as well as the GAL's recommendation that the court continue the existing shared parenting order. The court did find that the two older children, who had been portrayed as "vast underachievers" in the initial trial, progressed quickly in a traditional school setting. This caused the court to be concerned as to the extent the children were underachieving while in Mother's care. Nonetheless, the court indicated that Father's tutoring may have played a role in the children's turnaround. Notwithstanding these questions, the court found that the children were benefitting by attending grade school in Indiana and that they had more friends and were involved in more activities in Indiana that they ever were in Ohio. Accordingly, the court found that the children's best interest was served by maintaining the status quo. This court

finds nothing unreasonable or arbitrary about the court's decision and we therefore find no abuse of discretion. Accordingly, Mother's first assignment of error is overruled.

{¶ 45} Mother's Assignment of Error No. 2:

{¶ 46} THE TRIAL COURT ERRED IN AWARDING SUPPLEMENTAL GAL FEES.

{¶ 47} Mother argues that the court erred in ordering the parties to pay the GAL's fees. Mother argues that a "supplemental" fee request by the GAL was barred by res judicata and that the GAL failed to comply with a local rule requiring the GAL to seek court approval for work in excess of the monies on deposit. Father submitted no argument concerning this assignment of error.

{¶ 48} This court's review of the record indicates that the parties initially paid a deposit of $1,500 towards the GAL's fees. After the filing of the GAL's report, the GAL filed a motion requesting that the parties deposit additional funds to cover her fees incurred to date. The fees incurred totaled $6,257. Therefore, the GAL requested that the court release the deposit of $1,500 and order the parties to submit an additional $4,500 to pay the balance owed.

{¶ 49} The record reflects that the court released the $1,500 deposit to the GAL. Shortly thereafter, at a pretrial hearing, the court decided to delay ruling on the GAL's request for the additional $4,500 deposit until a final determination on the case.

{¶ 50} In the magistrate's subsequent decision recommending that the court issue a divorce decree, the magistrate recommended that the court order the parties to deposit an additional $2,760 for the GAL's fees. This figure corresponds to an amount listed in a letter the GAL sent to the magistrate following the trial, which summarized the additional fees the GAL incurred between filing of the GAL's report and the trial. The GAL's letter further stated that Father had agreed to pay for the GAL's time testifying at trial, so $825 of that amount

would be his responsibility. Presumably, the magistrate forgot about the earlier request for $4,500 and understood the GAL's letter as listing all the GAL's unpaid fees to date. Neither party objected to this aspect of the magistrate's decision and it was later adopted by the court. Nonetheless, it does not appear from the record that either party paid his or her share of the fees. The GAL alleged that the parties and court stopped copying her on filings in the case after she filed her report and she was thus unaware of the recommendation to grant her only $2,760 in fees.

{¶ 51} Following the filing of Mother's motion for modification of parenting rights, the court issued an order re-appointing the GAL to investigate Mother's claims and present the court with an updated recommendation. The order specifically directed the parties to deposit $1,000 towards the GAL's anticipated fees to produce a second report and instructed the GAL to limit her time on the case accordingly. Both parents eventually paid the requested deposit and upon the completion of the GAL's additional work, those monies were released to her.

{¶ 52} In the updated GAL's report, which was sent to the court in the form of a letter, the GAL mentioned the issue of the earlier magistrate's decision erroneously stating that the GAL was owed $2,760 but that her total billing so far on matters related to her work prior to re-appointment was $10,864 "minus the deposit." Thus, it would appear the GAL was requesting $9,364.

{¶ 53} Although it does not seem to be included in the record on appeal, the GAL thereafter sent the parties a "supplemental" billing statement. Mother responded by filing a motion objecting to the supplemental billing on grounds of res judicata and because the GAL had not followed Loc.R. 4.5(D)(2) of the Court of Common Pleas of Warren County, Domestic Relations Division, which provides: "[i]n the event the GAL determines that the

work required will exceed the fee deposit, the GAL shall seek prior Court approval, with notice to counsel and/or unrepresented parties, before incurring any fees that exceed the deposit."

{¶ 54} In response, the GAL stated that her unpaid invoice to date for her work as GAL was $7,650. The GAL further stated that she had been sending the parties itemized billing statements each month and had never received an objection to the scope of her work from either party. Mother responded to the GAL's filing and did not dispute receiving billing statements.

{¶ 55} The court issued an order correcting an "obvious error" in the divorce decree with respect to the GAL's entitlement to fees. The court noted that the GAL's actual fees, $10,864, were much higher than the erroneous amount contained in the magistrate's decision. Nonetheless, the court found that this was a lengthy and complicated divorce case that mandated increased work by the GAL and that both parties "were well aware of the guardian's efforts and, as a result, her bill." Accordingly, the court ordered the parties to pay "the outstanding invoice owed to the guardian * * *."

{¶ 56} A trial court has broad discretion to tax guardian ad litem fees as costs, including the amount of the fees and the allocation to either or both parties. *See* Civ.R. 75(B)(2); *Padgett v. Padgett*, 10th Dist. Franklin No. 08AP-269, 2008-Ohio-6815, ¶ 36; *Robbins v. Ginese*, 93 Ohio App.3d 370, 372 (8th Dist.1994); *Pruden-Wilgus v. Wilgus*, 46 Ohio App.3d 13, 16 (6th Dist.1988). We will not reverse unless we find an abuse of discretion, which indicates that the court acted unreasonably or arbitrarily. *Denier*, 2016-Ohio-4998 at ¶ 16.

{¶ 57} We find no abuse of discretion in the domestic relation court's decision. Initially, res judicata is inapplicable because the GAL claimed without dispute that the court

and parties were not copying her on filings and she had no notice of the initial erroneous order on fees. Next, Mother argues that the GAL's failure to follow Loc.R. 4.5(D)(2) prejudiced her because she had no opportunity to oppose the GAL's excess work. However, Mother did not contest the GAL's claim that she provided the parties with monthly itemized billing statements while her work was ongoing and that neither party objected to the scope of her work. Thus, Mother was aware of the GAL's ongoing work but chose to object on the basis of a local rule only after the GAL sent her supplemental bill. This is akin to invited error, i.e., "[a] party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make." *Lester v. Leuck*, 142 Ohio St. 91 (1943), paragraph one of the syllabus.

{¶ 58} The record in this case on the GAL's billing is unclear. We agree with the parties that the figure quoted by the court in its order appears to be erroneous. The GAL's last filing on this subject indicates that she is owed $7,650. Regardless, this court does not believe it is necessary to remand this matter to correct the error. The court's order generally specifies that the parties must pay the GAL "the outstanding invoice owed." The GAL is thus limited to billing for the fees actually invoiced and unpaid. Accordingly, this assignment of error is overruled.

{¶ 59} Father's Assignment of Error:

{¶ 60} THE TRIAL COURT ERRED WHEN THE COURT ORDERED FATHER TO PAY WIFE $14,000 IN A VERY SHORT PERIOD OF TIME WHEN THE COURT HAD NO EVIDENCE THAT FATHER HAD $14,000 WITH WHICH TO PAY WIFE AND NO REASONABLE WAY TO OBTAIN $14,000 WITHIN THE TIME ALLOWED BY THE ORDER.

{¶ 61} Father argues that the court abused its discretion in ordering him to sell certain real estate in West Virginia and divide the proceeds with Mother or otherwise pay $14,000 to

Mother just five days after the final divorce decree issued. Father contends that the court was aware that there was a title defect with the real estate and thus it would not sell easily and also that Father did not have assets available to pay Mother in lieu of selling the property.

{¶ 62} Property division in a divorce proceeding is a two-step process that begins with the court determining what assets constitute marital property and what assets constitute separate property. R.C. 3105.171(B). After classifying the property as separate or marital, "the court shall disburse a spouse's separate property to that spouse" and divide the marital property equally. R.C. 3105.171(C)(1) and (D). The trial court is given broad discretion in fashioning a property or debt division and will not be reversed absent an abuse of discretion. *Williams v. Williams*, 12th Dist. Warren No. CA2012-08-074, 2013-Ohio-3318, ¶ 54.

{¶ 63} This court does not find that the domestic relations court abused its discretion in ordering Father to sell the West Virginia real estate or pay Mother. Father contends that the court only provided him with five days from the date of the divorce decree to pay Mother. However, nearly two months before the divorce decree issued, the court filed its entry sustaining in part and overruling in part the parties' objections to the magistrate's decisions, which included the court's resolution of the West Virginia real estate issue. Thus, Father had approximately two months, not five days, to comply with the court's order. The amount of time provided to Father was not unreasonable. Accordingly, this court overrules Father's assignment of error.

{¶ 64} Judgment affirmed.

S. POWELL, P.J., and PIPER, J., concur.